IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Jacquetta McCall,<br><br>Plaintiff,<br><br>vs.<br><br>State Farm Mutual Automobile Ins. Co.,<br><br>Defendant. | Case No. 2:24-CV-04520-RMG<br><br>**MOTION FOR SUMMARY JUDGMENT AND IN THE ALTERNATIVE TO RECONSIDER** |

State Farm Mutual Automobile Insurance Company ("State Farm") files this motion seeking judgment as a matter of law because Plaintiff cannot prove at least two of the four elements required for a cause of action for bad faith failure to pay benefits under South Carolina law. The absence of these elements from Plaintiff's case is evident both from her deposition and from her Complaint seeking recovery for "bad faith [refusal] to pay the underinsured motorist benefits," (*see* Compl. ¶ 39).

Relatedly, State Farm respectfully asks this Court to reexamine the ruling and analysis in *Myers v. State Farm*, 950 F. Supp. 148 (D.S.C. 1997). Admittedly, the facts of *Myers* were similar to those present in this case. However, to the extent *Myers* eliminated the "refusal to pay benefits due under the contract" element of a bad faith claim for refusal to pay benefits, the decision is at odds with South Carolina law and should be revisited for several reasons:

1. *Myers* appears to have misinterpreted *Williams v. Selective*, concluding its dismissal of a bad faith claim was due to the absence of a duty of good faith prior to UIM litigation, rather than the insured's inability to establish benefits owed under the contract;

2. *Myers* relied on cases from three jurisdictions with UIM systems alien to South Carolina (two of the three permit direct actions for UIM benefits—the opposite of South Carolina; the third requires arbitration of UIM benefits, but bars pre-judgment contract or bad faith claims—which was the opposite of *Myers'* holding); and

3. *Myers* applied the holding of *Tadlock Painting*—applicable in situations unrelated to the payment of insurance benefits—to a suit for "bad faith in refusing to settle [*i.e.*, pay] and/or delaying such settlement," effectively eliminating one of South Carolina's four necessary elements of bad faith failure to pay: refusal to pay benefits due under the contract.

Indeed, *Myers* has never been cited by the South Carolina Supreme Court or South Carolina Court of Appeals in 28 years.

**Procedural History and Relevant Facts**

This matter arises from a December 9, 2023 car wreck between Plaintiff Jacquetta McCall and Claudia Tisdale. (Compl ¶ 10) (ECF No. 1-1, p. 4). Plaintiff retained counsel and, nine days after the accident, filed suit against Claudia Tisdale and The Montague Room, in the Charleston County Court of Common Pleas. (ECF No. 14-1, p. 3) (the "Underlying Litigation"). Plaintiff, who had underinsured motorist (UIM) benefits with State Farm (Compl. ¶ 6) (ECF No. 1-1, p. 4), served State Farm as UIM carrier pursuant to S.C. Code Section 38-77-160 on December 27, 2023 (ECF no. 14-2 p. 2)

While the Underlying Litigation was pending, on July 2, 2024, Plaintiff filed the present litigation alleging causes of action for breach of contract and bad faith. (ECF No. 1-1, p. 2). Plaintiff's sole allegation with respect to bad faith was: Defendant has, without just cause and in bad faith, refused to pay the underinsured motorist benefits to the Plaintiff. *Id.*

On August 23, 2024, State Farm moved for judgment on the pleadings. (ECF No. 5) On May 27, 2025, the Court granted judgment on the pleadings with respect to Plaintiff's breach of contract cause of action and denied it as to Plaintiff's bad faith cause of action. (ECF No. 13).

On June 24, 2025, Plaintiff was deposed. She confirmed she had still not settled with Claudia Tisdale's liability insurer, Allstate, and she had no idea how much the liability carrier would ultimately pay. She testified Allstate had offered Plaintiff $30,000 to settle her claims but she had not accepted it, and she is asking Allstate to pay her $200,000. (McCall dep., p. 25:9-

26:17) **(Exhibit 1).** She was unsure whether Allstate would ultimately pay her $30,000, less than $30,000, or more than $30,000. (Id., p. 26:14-17). Thus, under the Plaintiff's sworn deposition testimony it is unclear how much she will recover from the liability coverage, though she contends she is owed between $30,000 and over $200,000 from the liability carrier.

With respect to the UIM coverage, Plaintiff testified she never would have settled for State Farm's policy limits, and when shown her counsel's demands for UIM coverage, which she had not previously seen, she denied she would ever have settled for the policy limits.

> Q. Have you ever been willing to accept less than $200,000 from State Farm?
> MS. SMITH: Object to the form.
> A. Have I ever been -- no.
>
> (McCall dep., p. 41:25-42:3)
>
> Q. And so, as of March 27th, 2024,[1] would you have settled your claim for $50,000, your UIM claim?
> MS. SMITH: Object to the form.
> A. No.
> Q. Would you have settled your UIM claim for $100,000 on March the 27th of 2024?
> A. No.
> Q. Would you have settled your UIM claim for $150,000 on March 27th of 2024?
> A. No.
>
> (McCall Dep. 49:20-50:5).

## Standard of Review

*Summary Judgment*

Summary judgment is proper when the record conclusively shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To overcome summary judgment, a plaintiff must point to admissible

[1] This is the date of Plaintiff's letter demanding the UIM limits of $50,000. **(Exhibit 2)**

evidence in the record creating a "genuine" issue as to a "material" fact, i.e., facts that might affect the outcome. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Factual disputes, which are irrelevant or unnecessary will not be counted. *Id*. The purpose of summary judgment is to avoid a useless trial. It is a device used to make possible the prompt disposition of a controversy on its merits without a trial, if in essence, there is no real dispute as to the salient facts. *Bland v. Norfolk and Southern Railroad Co.*, 406 F.2d 863, 866 (4th Cir. 1969).

Summary judgment is appropriate—even before discovery closes—so long as additional discovery wouldn't alter the outcome. *See Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995) (Summary judgment may be granted despite pending discovery "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment."); *McClure v. Ports*, 914 F.3d 866, 875 (4th Cir. 2019) ("a court need not allow discovery unless a plaintiff identifies material, disputed facts.").

*<u>Reconsideration</u>*

Under Federal Rule of Civil Procedure 54(b), the district court retains the power to reconsider and modify its interlocutory orders at any time prior to final judgment when such is warranted. *See Am. Canoe Assoc. v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th Cir. 2003); *United States v. Duke Energy Corp.*, 218 F.R.D. 468, 473-74 (M.D.N.C. 2003) ("A court may revisit interlocutory orders at any time prior to final judgment under Fed. R. Civ. P. 54(b) or its inherent authority."). This standard allows the trial court to conduct a *de novo* review of its pretrial rulings. *Eady v. Koon*, No. 3:12-CV-1671-CMC, 2013 WL 1816597, at *1 (D.S.C. Apr. 29, 2013). A district court should modify a prior ruling when the court is convinced that the prior ruling was incorrect, *Eady*, 2013 WL 1816597 at *1, or when the court has misapprehended the facts or

applicable law, *Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp.*, 402 F. Supp. 2d 617, 619 (M.D.N.C. 2005).

## Argument

### I. State Farm is entitled to summary judgment due to lack of causation.

Plaintiff's deposition testimony requires summary judgment be granted due to lack of causation. Plaintiff's bad faith cause of action lists one complaint against State Farm: it "refused to pay the underinsured motorist benefits to the Plaintiff." Putting aside the fact that no UIM benefits were owed to the Plaintiff at this time (which is addressed further below), her claim fails.

Causation and damages are necessary elements of any bad faith cause of action and the failure to allege or prove them is fatal to Plaintiff's claim. *Snyder v. Auto-Owners Ins. Co.*, 634 F. Supp. 3d 252, 264–65 (D.S.C. 2022) (granting summary judgment on the insureds' bad faith claim, premised on the insurer's pursuit of subrogation, because they "failed to identify any consequential damages flowing from [the insurers'] alleged bad faith related to the filing of the subrogation action"). Here, Plaintiff's sworn testimony is that if State Farm had done what she alleges it should have—offered the UIM benefits after her March 27, 2024 demand—she would not have accepted them. In fact, she would not have accepted them, had State Farm offered twice those limits.

> Q. And so, as of March 27th, 2024, would you have settled your claim for $50,000, your UIM claim?
> MS. SMITH: Object to the form.
> A. No.
> Q. Would you have settled your UIM claim for $100,000 on March the 27th of 2024?
> A. No.
> Q. Would you have settled your UIM claim for $150,000 on March 27th of 2024?
> A. No.

(McCall Dep. 49:20-50:5).

Bad faith, like any tort, requires the Plaintiff to prove the alleged tortious conduct proximately caused her damages. *Hood v. United Services Auto Assoc.*, 910 S.E.2d 767, 771 (S.C. 2025). Here, Plaintiff admits that had State Farm offered the benefits, she would not have accepted them. Accordingly, Plaintiff's bad faith claim fails for lack of causation. *See e.g. Gregory v. R.J. Reynolds Tobacco Company, Inc.*, 7:20-cv-04257-TLW, 2023 WL 6157381, at *2 (D.S.C., September 21, 2023) (summary judgment appropriate where Plaintiff cannot "prove or forecast causation.")[2]

**II. State Farm is also entitled to summary judgment because Plaintiff's bad faith claim is not viable prior to a judgment against the tortfeasor. Alternatively, the Court should reconsider its partial denial of State Farm's Motion for Judgment on the Pleadings.**

This Court must interpret and enforce South Caroliana law with respect to Plaintiff's common law claim for bad faith failure to pay. *See State Farm Fire and Cas. Co. v. Admiral Ins. Co.*, 225 F.Supp.3d 474, 481 (D.S.C., 2016) (""[t]he principles of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), require a federal court in a diversity case to respect and enforce state-created rights…") *(quoting Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1416 (4th Cir. 1992)).

Plaintiff's suit for bad faith[] refus[al] to pay the underinsured motorist benefits to the Plaintiff" requires her to prove four elements under South Carolina law.

(1) the existence of a mutually binding contract of insurance between the plaintiff and the defendant;

[2] Additionally, because Plaintiff is unsure of what amount she will recover from the liability carrier—apparently at least $30,000, and perhaps more than $200,000—it is unclear what setoff would be applied to her UIM coverage. This is in addition to the fact that the amount to which Plaintiff is legally entitled to recover (before the setoff is applied) is also unknown. *See e.g.*, J. McCall Dep, p. 30-31, ln. 24-8. ("Q. And how much will a jury award you against Ms. Tisdale? A. I don't know. Q. Why not? A. Because I'm not the juror or the jury. I can't speak for them to say how much they'll award me. Q. We're going to have to wait and see, aren't we? 8 A. Yeah.")

(2) refusal by the insurer to pay benefits due under the contract;

(3) resulting from the insurer's bad faith or unreasonable action in breach of an implied covenant of good faith and fair dealing arising on the contract;

(4) causing damage to the insured.

*Hood v. United Services Auto Assoc.*, 910 S.E.2d 767, 771 (S.C. 2025) (*quoting Howard v. State Farm Mut. Auto. Ins*., 450 S.E.2d 582, 586 (1994). Thus, if Plaintiff cannot establish "benefits due under the contract," or any other *prima facie* element of her claim, her bad faith claim fails under South Carolina law.

*Myers v. State Farm* cannot save Plaintiff from the simple fact that she cannot meet the elements of a suit for bad faith refusal to pay. Interpretation of *Myers* is, frankly, challenging, but to the extent *Myers* eliminates a necessary element of a bad faith claim, it does not reflect South Carolina law and should not be followed. All four elements of the cause of action are still required by the South Carolina Supreme Court. *See Hood* at 771.

Additionally, to the extent *Myers* interpreted *Tadlock* as eliminating the second element of bad faith in a suit for "bad faith failure to pay" it should not be followed. *Tadlock* recognized an exception to the bad faith cause of action where the payment of benefits is not at issue—it did not eliminate the second requirement of bad faith, and certainly did not do so in a case, like this one, where a plaintiff bases her claim on a "bad faith refus[al to pay."

**A. *Myers'* reasoning is flawed and does not accurately reflect South Carolina law.**

**1. *Myers* misinterpreted *Williams*, determining it hinged on the lack of a duty of good faith as opposed to the fact no benefits were due under the policy.**

**a. *Williams* focused on the breach of contract cause of action, and did not directly address the bad faith cause of action.**

*Williams v. Selective Ins. Co. of Se.*, arose from summary judgment on two causes of action, breach of contract and bad faith; however, the opinion only directly addressed the contractual cause

of action. 446 S.E.2d 402, 403 (S.C. 1994) Its "Issue" heading listed just one issue: "Whether an insured's failure to comply with [§ 38-77-160] bars *recovery of underinsured motorist benefits*?" *Id.* (emphasis added). It then answered that question only, noting section 160's intent to protect a UIM carrier's right to "contest its liability *for underinsured benefits*." *Id.* (emphasis added). The court held that no UIM benefits (*i.e.*, contractual benefits) were recoverable and ended its analysis.

Importantly, *Williams* did not analyze or discuss the bad faith cause of action. After the first sentence it never mentioned "bad faith." *Id.* at 403-404. At no point did the opinion discuss or refer to the carrier's reasonableness; it never discussed consequential damages, or any damages distinct from contract damages; and it never discussed the duty of good faith and fair dealing, much less when it arose or when it applied under the facts. *Id.* In short, the *Williams* court simply concluded a failure to comply with section 38-77-160 barred a claim for UIM benefits. The court was never asked—and therefore never addressed—whether a bad faith claim existed independent of a breach of contract claim.

**b. In *Williams*, the reason for the dismissal of bad faith was simple: the insured could not establish a right to benefits under the policy.**

The *Myers* court, however, interpreted *Williams* as holding that the bad faith cause of action was improper because the carrier's duty of good faith and fair dealing had not arisen and could not arise until the insured filed suit against the tortfeasor. This interpretation is not based on any analysis in *Williams*, which never discussed a duty of good faith and fair dealing, let alone when it arose. This is because, under the court's bad faith precedent, the determination that no UIM benefits were owed under the contact necessarily required dismissal of the plaintiff's cause of action, specifically described as a cause of action for "bad faith refusal to pay." 446 S.E. 2d at 403.

*Williams* was decided in 1994, when the relatively new tort of first-party bad faith had only been applied to a refusal to pay benefits under the contract, and one of its essential elements was

"refusal by the insurer to pay benefits due under the contract."[3] *Howard, supra, at* 586. Indeed, the South Carolina Supreme Court had to that point described the cause of action as "bad faith refusal to pay first party benefits" under an insurance policy. *See Nichols v. State Farm Mut. Auto. Ins. Co.*, 306 S.E.2d 616 (S.C. 1983) ("This is a tort action for bad faith refusal to pay first party benefits under an insurance policy.").[4] Thus, in *Williams*, the insured's bad faith claim could not survive after the contract claim failed. In other words, after *Williams* determined there could be no recovery of UIM benefits it followed, under all existing bad faith precedent, the bad faith claim necessarily failed.

**c. *Myers* incorrectly interpreted *Williams* as turning on the timing of the filing of Williams' bad faith cause of action.**

*Myers* appears to have treated *Williams'* discussion of the breach of contract claim as if it were a discussion of the bad faith claim, which was never directly discussed. *See Myers*, 950 F. Supp. at 150 ("At most, *Williams…* establish[es] that the carrier's duty to act in good faith regarding underinsured benefits arises after the insured brings suit against the at-fault driver and serves the carrier with process."). *Myers* failed to recognize in *Williams*, while the timing of filing suit against the at-fault tortfeasor was critical to the dismissal of the breach of contract claim, what mattered to the bad faith claim was the insured's inability to establish "benefits due under the contract."

As a result, *Myers* relied upon an unprecedented conclusion: an insurer's duty of good faith and fair dealing under a UIM policy "arises after the insured brings suit against the at-fault driver

---

[3] An exception to this rule, applicable to certain third-party claims, was announced only after *Williams*, and was not part of the court's analysis. *See* discussion of *Tadlock v. Maryland Casualty*, below.
[4] The tort was also described in *Williams* as "an action for … bad faith refusal to pay." 446 S.E. 2d at 403.

and serves the carrier with process." 950 F. Supp. at 150.[5] In *Myers*' view, if *Williams* required the filing and service of the tort suit before "an action for underinsured benefits" could be brought, *Williams*, 446 S.E. 2d at 404, then under *Williams* the UIM carrier owed no duty of good faith to its insured regarding UIM coverage before that procedural step. *Myers*, 950 F. Supp. at 150.

*Myers* interpretation of *Williams* also conflated the existence of a duty with the accrual of a cause of action. It reasoned that "a *fortiori*, at the moment the duty arises… it can be breached by the carrier," even if that breach occurs before any tort judgment. *Id.* This bypassed the question of ripeness. A necessary element of Williams' cause of action for "bad faith refusal to pay " was a contractual entitlement to be paid. But no entitlement could occur in the absence of a judgment against the tortfeasor. *See Laird v. Nationwide Ins. Co.*, 134 S.E.2d 206, 209 (S.C. 1964) In short, any determination of whether a UIM insurer is liable for a bad faith failure to pay is contingent on a finding UIM benefits are owed. An issue that is contingent is not ripe for judicial review. *Colleton Cnty. Taxpayers Ass'n v. Sch. Dist. of Colleton Cnty.*, 638 S.E.2d 685, 694 (S.C. 2006).

Additionally, it is axiomatic that a cause of action does not accrue at the time a duty arises; rather, all elements of a cause of action must exist and culminate in an injury. *See McAlhany v. Carter,* 781 S.E.2d 105, 112–13, (S.C. Ct. App. 2015) ("Because a personal injury cause of action cannot accrue until there is an injury, McAlhany's cause of action accrued at the earliest on August 16, 2009—the time he suffered an injury and thus had a legal right to sue on it.) (Internal quotations omitted). *Myers*, however, treated the inception of the duty as identical to the maturity of a tort

[5] In a footnote, *Myers* offers an alternate explanation for *Williams* dismissal of bad faith, suggesting *Williams* may have found the insured's failure to comply with § 160 waived the right to enforce the duty of good faith. Though it was *dicta*, this also appears to be a misinterpretation of *Williams* which made no factual finding or even a reference to waiver of the *insured's rights* and only referred to the insured's waiver of the *insurer's right* to defend the tort suit. In the thirty-one times *Myers* has been cited the undersigned has not been able to find one endorsing *Myers'* "waiver" theory of *Williams*.

claim, creating a procedural trigger for bad faith litigation that is untethered from the four elements of a bad faith cause of action.

*Myers'* interpretation of *Williams* is unusual. If the mere filing and service of suit give rise simultaneously to a duty of good faith and the "*a fortiorari*" ability to sue for bad faith, then the insured in *Williams* could have pursued her bad faith suit notwithstanding the dismissal of her breach of contract claim by merely filing a new suit. While the statute of limitations would bar the substantive claims against the tortfeasor, Ms. Williams would still be able to file suit and serve the carrier and, according to *Myers'* analysis, thereby bring a bad faith cause of action into being.[6] Similarly, under *Myers'* interpretation, an insured could be barred from suing for UIM benefits (because they were not owed) while simultaneously able to sue for bad faith for failing to pay those non-owed benefits. This conclusion is not supported by *Williams*, was contrary to South Carolina law, and defies common sense.[7]

Indeed, the *Myers* court itself seemed unsure about its reading of *Williams*. It described its interpretation as being "at most" what *Williams* stood for (acknowledging uncertainty as to *Williams'* holding), and in a footnote, it conceded "[i]t could well be argued that the carrier's duty to act in good faith and deal fairly with the insured arises at the moment the underinsured policy

[6] The statute of limitations begins to run upon accrual, so if *Myers* were correct that filing suit against the tortfeasor gave rise to a duty of good faith, and a simultaneously viable cause of action for bad faith, Ms. Williams, or her Estate if she is no longer living, could trigger that duty *tomorrow* or any time in the future, by merely filing and serving a time-barred tort suit. It could not have been the *Williams* court's intention to allow the pursuit of a bad faith claim in perpetuity.

[7] This interpretation has led to a recent increase in bad faith "value disputes," like this one, filed before the resolution of the underlying tort claim, creating needless litigation concerning litigation and resulting in unusual conduct by litigants. (See July 14, 2025 email exchange marked as **Exhibit 3)**

is purchased." *Id.* n.1. However, *Myers* could not accept this alternative argument or its interpretation of *Williams* would collapse.[8]

**d. This Court has backed away from *Myers'* no-duty-until-suit interpretation of *Williams*.**

After *Myers*, this Court has repeatedly backed away from its no-duty-until-suit interpretation of *Williams*. Some cases have placed greater emphasis on the *Myers'* court's "[i]t could well be argued" footnote or otherwise deemphasized the fact that *Myers'* entire holding hinged upon the no-duty-until-suit interpretation of *Williams*. *See, e.g. Halmon v. American Intern. Group, Inc. Ins. Co.*, 586 F. Supp. 2d 401, 406 (D.S.C. 2007) (noting "the precise chronological genesis of an insurer's good faith duty to pay or settle UIM benefits in the absence of a legal determination of fault on the other party was an issue that the [*Myers*] court declined to conclusively decide.").

Other cases have more explicitly expanded the scope of *Myers'* interpretation of *Williams*. These cases gut *Myers'* reasoning, holding a duty of good faith arises upon the making of a claim, and service of suit is not required to trigger the duty. *Snyder v. State Farm Mut. Auto. Ins. Co.*, 586 F. Supp. 2d 453, 458 (D.S.C. 2008) ("This court has recently explicitly followed the rule of *Myers* that a UIM insurer's duty of good faith arises when the insured has **filed a claim** against the at-fault driver.") (emphasis added); *Wilkins v. State Farm Mut. Ins. Co.*, 2008 WL 2690240, at *6 (D.S.C. 2008) (addressing plaintiff's contention that a UIM carrier may have an obligation to act in good faith prior to litigation and "assum[ing] without deciding that a duty of good faith and fair dealing **arises at least upon** an insurer's receipt of **notice of an insured's claim** under a UM

---

[8] If the duty of good faith and fair dealing arose when the policy was sold and included conduct unrelated to the failure to pay, *Myers*' explanation for why the bad faith count in *Williams* was dismissed would necessarily fail. This is because *Myers* overlooked the more logical conclusion that Williams' bad faith claim was dismissed because she could not establish benefits owed under the contract.

policy") (emphasis added); *Tucker v. Peerless Ins. Co.*, No. 4:13-cv-01809-BHH, 2017 WL 839532, at *5 (D.S.C. Mar. 3, 2017) (stating "an insurer has a duty to act in good faith towards the insured once the insured **files a claim** against the at-fault driver"); *Senn Freight Lines Inc. v. American Inter-Fidelity Corporation*, 2020 WL 553854, at *6 (D.S.C., 2020) (quoting *Tucker* and stating a good faith duty can arise upon filing a claim, and stating it is not required that the insured serve pleadings on the insurer).[9]

The Court's more modern interpretations of *Myers*, suggesting the duty of good faith arises upon "notice of a claim" and pleadings do not need to be served on the insured prior to a bad faith suit, are wholly incompatible with *Myers'* interpretation of *Williams.* Indeed, *Williams* makes clear that the "claim for benefits" was made within the statute of limitations. 446 S.E.2d at 403, n.1 (noting the insurer's "failing to act on Williams's claim for benefits until after the statute had run"). If the duty had arisen at that time, under *Myers'* interpretation, it could have supported the bad faith claim, and *Williams* would have come out differently as to the bad faith cause of action. *Myers*, 950 F. Supp. at 150 ("*A fortiori*, at the moment the duty arises, which is at least by that time, it can be breached by the carrier…).

**2. *Myers* relied on inapplicable authority from Iowa, Oklahoma, and California.**

*Myers* also buttressed its conclusion with cases from three other jurisdictions—Iowa, Oklahoma, and California—which it stated had rejected insurers' "prematurity" defenses in UIM bad faith cases. 950 F. Supp. at 150-51. However, those cases did not support *Myers*' conclusion, because, unlike South Carolina, Iowa and Oklahoma permit direct actions against an insurer for

[9] A notable exception is *Halmon*, where the Court was faced with "the extreme measure of either overruling or expansively interpreting *Myers*" and instead took a "middle path," unambiguously stating that no duty of good faith arose prior to filing suit against the tortfeasor. 586 F. Supp. 2d 401 (D.S.C. 2007). Like *Myers*, *Halmon* has never been cited by the South Carolina Supreme Court or the South Carolina Court of Appeals in the last 18 years.

UIM benefits , and California does not allow bad faith suits over UIM benefits prior to a determination of the amount of benefits owed (which is the opposite of *Myers*).

**a. Iowa: *Handley v. Farm Bureau***

The *Myers* court first cited *Handley v. Farm Bureau Mut. Ins. Co.*, 467 N.W.2d 247 (Iowa 1991). But Iowa's UIM law is much different than South Carolina's UIM law. Ironically, just before citing *Handley*, the *Myers* decision recognized that South Carolina law forbids "an action *ex contractu* against" a UM or UIM carrier before a judgment is "first [] obtained against the uninsured driver." 950 F. Supp. at 150. (citing *Lawson v. Porter*, 180 S.E.2d 643 (S.C. 1971)).

With respect to "prematurity" Iowa law is contrary to the longstanding law of South Carolina as stated in *Lawson v. Porter*. The first paragraph of *Handley* reveals it was a single suit by an insured against a tortfeasor for wrongful death, combined with a suit against an insurer for breach of contract and for bad faith. 467 N.W. 2d at 248. Thus, in *Handley*, the insured was allowed to sue the tortfeasor for negligence *and simultaneously* sue the UIM insurer for breach of contract *and* bad faith. *Id*. at 249. The Iowa court held it was not "premature" to bring the UIM claims without a prior tort judgment, because Iowa treats the UIM claim as ripe once the tortfeasor's liability is at issue. *Id*. The rationale of *Handley* does not cross over and is the polar opposite of South Carolina's approach under Section 38-77-160, which ***prohibits*** a contract action on UIM coverage before establishing the tortfeasor's liability. Thus, Iowa law offers no guidance in a state like South Carolina where a judgment is a prerequisite to a contractual right to benefits.

**b. Oklahoma: *Buzzard v. Farmers***

The same issue exists with respect to *Myers*' reliance upon *Buzzard v. Farmers Ins. Co.*, 824 P.2d 1105 (Ok. 1991). *Buzzard* involved an appeal from a single trial where the jury (1) determined liability of the tortfeasor; (2) apportioned liability between the plaintiff and defendant;

(3) determined actual damages caused by the tortfeasor; (4) determined the amount owed under the UIM contract; and (5) determined actual damages and punitive damages as a result of bad faith. 824 P.2d at 1108. Again, as is obvious from the makeup of the trial, Oklahoma law does not align with South Carolina's law, because in Oklahoma "[t]he insured may proceed against the underinsurer without first adjudicating the liability issues against the tortfeasor." *Id.* at 1112. *Myers* was thus mistaken in looking to Oklahoma UIM law to support its conclusion.

**c. California: *Ramirez v. USAA***

Finally, *Myers* cited *Ramirez v. USAA Casualty Co.*, 285 Cal. Rptr. 757 (Cal. Ct. App. 1991), as supporting the conclusion it drew from *Williams*. 950 F. Supp. at 150-51. However, California UIM law, which requires arbitration and has no analog to Section 38-77-160, also differs significantly from South Carolina law. Moreover, *Ramirez* involved a totally different factual scenario from *Myers*: an insurer's bad faith in refusing to <u>disclose the amount of UIM coverage</u> to its insured, which hampered the insured's ability to settle with the tortfeasor. 285 Cal. Rptr. At 758-64. Importantly, the bad faith claim was not about refusal to pay UIM benefits (no UIM payment was due until after the tort case or arbitration), but about a separate duty – disclosure of coverage – which the insurer breached, causing prejudice to the insured's legal strategy. *Id*. That fact pattern is a far cry from *Myers*, in which the dispute was squarely about paying the UIM claim.

In fact, had *Ramirez* involved a claim for failure to pay UIM benefits (as is the case here), California law would have dictated the <u>opposite</u> outcome. *Brehm v. 21st Century Ins. Co.*, 83 Cal. Rptr. 3d 410, 417 (Cal. Ct. App. 2008) ("As a general rule … there can be no breach of the implied covenant of good faith and fair dealing if no benefits are due under the policy...Absent that contractual right [to policy benefits], the implied covenant has nothing upon which to act as a supplement, and 'should not be endowed with an existence independent of its contractual

underpinnings.'") (*citing Waller v. Truck Ins. Exchange, Inc.*, 900 P.2d 619 (Cal. 1995)); *see also*, *Carrasco v. State Farm Ins*., 2019 WL 134568 (D. Cal. 2019) (dismissing bad faith claim where UIM insured had not satisfied statutory prerequisites to recover UIM benefits because "[a]bsent a valid breach of contract claim, [the] breach of the implied covenant of good faith and fair dealing claim also fails").

**3. *Myers* should not have applied the holding in *Tadlock* to a claim for refusal to pay UIM benefits ("refusing to settle.")**

In addition to misconstruing *Williams* and relying on extra-jurisdictional cases contrary to South Carolina law, *Myers* also applied *Tadlock Painting Co. v. Maryland Casualty Co.*, 473 S.E. 2d 52 (S.C. 1996), when it should not have, essentially reading *Tadlock* as eliminating the second of four bad faith elements under South Carolina law. *Tadlock*'s holding was far more limited and had no application in a first-party suit for "bad faith in refusing to settle and/or delaying such settlement" as was *Myers*. 950 F. Supp. at 149.

**a. *Tadlock* did not eliminate the second requirement of bad faith.**

Since at least 1986, the tort of bad faith in South Carolina has repeatedly been described as containing four elements:

> the existence of a mutually binding contract of insurance between the plaintiff and the defendant; (2) a refusal by the insurer to pay **benefits due under the contract;** (3) resulting from the insurer's bad faith or unreasonable action in breach of an implied covenant of good faith and fair dealing arising on the contract; (4) causing damage to the insured.

*Bartlett v. Nationwide Mut. Fire Ins. Co*., 348 S.E.2d 530, 532 (S.C. Ct. App. 1986) (emphasis added) (citing *Nichols*, among others), *overruled on other grounds by Charleston Cnty. Sch. Dist. v. State Budget & Control Bd.*, 437 S.E.2d 6 (S.C. 1993). This four-part formulation of the tort has been adopted and repeated many times since 1986 and was recited by the South Carolina Supreme Court just this year. *See Hood v. United Services Auto Association*, 910 S.E.2d 767, 771 (S.C.

2025) ("The elements of a bad faith claim for failure to pay first-party benefits are … (2) refusal by the insurer **to pay benefits due under** the contract; …") (emphasis added).

If *Tadlock* had eliminated the second element of bad faith, the South Carolina Supreme Court and Court of Appeals would not have continued to include that element in their recitations of the bad faith cause of action for the next twenty-nine years.

Similarly, this Court has continued to recite four—not three—elements of bad faith, including the "refusal by the insurer to pay benefits due under the contract," and it has granted summary judgment to the insurer where "an insurance policy excludes coverage for the claimed loss [because] the insured 'cannot maintain [a] cause of action for bad faith refusal to pay **because no payment was due under the policy**.'" *USAA Casualty Insurance Company v. Gordon*, 2:22-cv-03504-RMG, 2023 WL 7115524, at *5 (D.S.C., Oct. 16, 2023) (emphasis added) (clarified on other grounds at 2023 WL 11886064) (quoting *Clayton v. Nationwide Mut. Ins. Co.*, 260 F.Supp.3d 514, 521 (D.S.C. Jun. 1, 2017), and citing *Moss v. Minnesota Life Ins. Co.*, No. 15-cv-1679, 2017 WL 5635449, at *8 (D.S.C. Mar. 29, 2017)); *see also*, *Morris v. Auto-Owners Insurance Company*, 2016 WL 7473430, at *9 (D.S.C. 2016) (noting four elements of bad faith including refusal to pay benefits due and holding "Plaintiffs may not maintain" their bad faith claim, which was "based on the allegation that Defendant refused to make payments for damages to their home caused by the circumstances alleged in the complaint," "[b]ecause the court ha[d] already concluded as a matter of law that no such payments were due under the policy"); *CAMICO Mutual Insurance Company v. Jackson CPA Firm*, 2:15-cv-1823-PMD, 2016 WL 7403959, at *14 (D.S.C., December 22, 2016) (citing the four elements of bad faith and holding that where there was no breach of contract "the [insureds' bad faith] claim fails at the second element"

because“[a]lthough CAMICO [wa]s not providing all the indemnity and defense coverage that the Accountants s[ought], it ha[d] not refused to pay any benefits actually due.”).

In sum, the decisions of the South Carolina Supreme Court, the South Carolina Court of Appeals, and this Court all show a refusal to pay benefits due under the contract remains an element of most bad faith cases. *Myers’* use of *Tadlock* to eliminate that element was therefore erroneous.

**b. *Tadlock* is properly applied to cases that do not concern payment of benefits.**

*Tadlock’s* discussion—just five paragraphs—is heavy on citations, but short on reasoning. However, *Tadlock*’s key feature is that the bad faith damages complained of by the insured *were not related to* a failure to pay benefits owed: they arose from the insurer’s conduct in exercising its right to investigate and settle claims, which a jury found damaged the insured, independent of the duty to pay benefits. This peculiar factual scenario is what caused the court to adopt a unique approach for handling bad faith that results in injury distinct from nonpayment of monetary benefits due under the policy.

In *Tadlock*, the insured was not harmed by an insurer refusing to pay a covered loss; in fact, the loss was below deductible. Rather, the insurer’s claim handling conduct caused *other harm* to the insured—the loss of future business opportunities. Thus, *Tadlock* marked a new and unusual application of the bad faith tort in South Carolina which applies to a small category of cases where

the insured is harmed by something other than the nonpayment of benefits and sustains an independent, discrete injury.[10]

*Tadlock*-like situations are uncommon. *See, e.g. Deese v. State Farm Mut. Auto. Ins. Co.*, 838 P.2d 1265, 1270 (Ariz. 1992) ("We grant that in the usual case a bad faith claim will be predicated on the breach of an express covenant in the policy."); *Robinson v. North Carolina Farm Bureau Ins. Co.* 356 S.E.2d 392, 395 (N.C. Ct. App. 1987) (surveying North Carolina bad faith law and noting "most, if not all, of the cases have as a factual background the insurance company's refusal to pay."). Indeed, as noted by Appleman, only rarely do bad faith claims involve harm beyond the denial of insurance benefits:

> In rare circumstances, an insurer mishandles a claim in a way that injures the non-insurance interests of an insured. In such cases, liability may be found without regard to coverage or most of the usual requirements of bad faith. Arguably, these are not true bad faith cases, but that distinction is important only to theorists.

*New Appleman Insurance Bad Faith Litigation, § 5.06 Bad Faith Without Coverage (2d ed.); see also*, Ashley, Stephen, Bad Faith Actions Liability & Damages, § 5A:2 *Bad faith in the absence of coverage* (2d. ed.) ("The problem of bad faith in the absence of coverage arises **infrequently**. In the **great majority** of bad-faith cases, the plaintiff complains, in essence, that his insurer

[10] Some cases have tried to reconcile *Tadlock* with the remainder of South Carolina's bad faith law by suggesting *Tadlock* applies to allegations an insurer failed to properly "process" a claim, while the traditional elements only apply to an insurer's failure to "pay" a claim. This is a distinction without a difference, because a failure to pay, if actionable, is *the harm resulting from* an insurer's failure to properly process its insured's claim. If the presence of "failure to properly process" allegations excused the "refusal to pay benefits" element of bad faith, the element would be eliminated altogether, not just in *Tadlock*-like situations. Instead of focusing on a distinction without a difference between processing and payment—two inherently correlated things—the focus should be on whether the *harm complained of* relates to the nonpayment of benefits (as it usually does) or if it is unrelated to the benefits due under the policy (as was the case in *Tadlock*). The harm in *Tadlock* was not a failure to pay but was that the insured's customer would "not consider it for any more painting jobs because of the delay in cleaning Cargill's employees' cars." 473 S.E.2d at 53. Regardless, Ms. McCall's only bad faith allegation pertains to the insurer's failure to pay.

unreasonably denied or delayed payment of a claim. It thus makes sense to hold that if the policy provides no coverage, then the insured has no bad-faith claim, but in **a significant minority** of claims, the plaintiff bases his accusations of bad faith on something other than the mere nonpayment of benefits, and if those accusations are well-founded, the plaintiff should recover damages for the harm the insurer's misconduct caused, even if the policy does not cover the loss.") (emphasis added).

*Tadlock* cited two of these "rare" cases (both from Arizona) in its opinion: *Rawlings v. Apodaca* and *Deese v. State Farm.*[11] Reviewing those cases demonstrates why they—and *Tadlock* itself—differ from the usual bad faith case requiring a refusal to pay benefits owed.

In *Rawlings*, the insurer (Farmers) paid the insureds full policy limits quickly after a fire damaged their property. 726 P. 2d 565, 568 (Ariz. 1986). The Rawlings believed they had a potential claim against their neighbor for starting the fire, but when they asked Farmers if Mr. Rawlings should have his own investigation done, Farmers told them "he would receive a copy of their report and need not undertake his own investigation." *Id.* The Rawlings therefore did not hire their own investigator, but when Farmers' investigation showed their neighbors (who also were insured by Farmers) started the fire, Farmers refused to provide the report to the Rawlings. The Rawlings sued Farmers for first-party bad faith. As was the case in *Tadlock* the bad faith harm complained of had nothing to do with the payment of policy benefits. And this fact caused the court to establish the law quoted and relied on in *Tadlock*: it found that "failure … to pay the claim"

[11] Tadlock's footnote 4 cites eight cases which are more far afield, and in any event do not support *Myers'* holding. In fact, the first case cited, *Opperman v. Nationwide Mut. Fire Ins. Co.*, was contrary to *Myers'* holding as it involved a suit for bad faith *and* recovery of UIM benefits, filed *after* the amount of damages had been determined through arbitration. 515 So.2d 263, 267 (Fla. Dist. Ct. App. 1987).

was not the *sine qua non* of a bad faith cause of action and allowed the Rawlings' bad faith verdict to stand against Farmers. *Id.* at 573.

*Deese* is heavier on law than facts, with the "evidence in the month-long trial" reduced to a few sentences regarding "the general positions of the parties." 838 P.2d 1265, 1267 (Ariz 1992). However, the most useful part of *Deese* is the concurrence of Justice Martone, which sets forth an analytical framework that explains a common sense meaning behind the rule announced in *Tadlock.* Only where the damages sought by the insured are unrelated to the benefits sought or due under the policy should breach of contract not be a prerequisite to a bad faith claim:

> Whether breach of contract is a prerequisite to a bad faith tort claim depends upon the similarity between the essential ingredients of each claim. Where the claims are essentially the same, the answer to the question should be a resounding "yes." For example, where there is a claim for breach of contract for failure to pay benefits on the policy, and the bad faith tort claim is based on an allegation that the failure to pay was without a reasonable basis…then proof of the contract claim is a prerequisite to the bad faith tort claim. By definition, if the defendant has not breached its contract with the plaintiff, then it had a reasonable basis to deny the claim.
>
> At the other extreme, where the claim of bad faith has nothing at all to do with the contract claim, as in *Rawlings v. Apodaca*, 151 Ariz. 149, 726 P.2d 565 (1986), then proof of the contract claim is irrelevant to proof of the bad faith tort claim. In *Rawlings*, the … bad faith tort claim was for failing to disclose to the insured favorable information which would have helped the insured in a separate dispute with its neighbor. *Id*. These were wholly different claims and thus Farmers' payment of the contract claim was irrelevant to the assertion of the bad faith tort claim. In that context, the contract claim was not an essential ingredient of the tort claim.
>
> …
>
> I therefore suggest the following analytical framework to explain today's decision. Whether breach of contract is a prerequisite to a bad faith tort claim depends upon whether the contract claim is an essential element of the tort claim. If it is, then breach of contract is a prerequisite to the bad faith tort claim. If not, then breach of contract is not a prerequisite to the bad faith tort claim.

838 P.2d at 1271 (Martone, J., concurring).

Justice Martone's reasoning makes sense, has been followed by subsequent decisions in Arizona,[12] and is consistent with both common sense and South Carolina law. *Tadlock* followed Justice Martone's reasoning, holding that no contractual right to recover benefits need be shown because the insured in *Tadlock* was not alleging harm due to the non-payment of benefits, he was alleging harm due to mishandling and resultant delay of incipient tort claims against him, resulting in the loss of a customer. Thus, that *Tadlock* is a limited exception applied in these rare situations is bolstered not just by the fact that South Carolina courts have routinely, after *Tadlock*, stated bad faith requires proof of a refusal to pay benefits due, but also by the reasoning set forth in *Tadlock* and the cases upon which it relied.

**B. This Court should reject *Myers* to the extent it is inconsistent with South Carolina law and should not apply *Tadlock* to these facts.**

Where a Plaintiff cannot meet all of the elements of a cause of action, summary judgment should be granted. *See e.g. Gregory v. R.J. Reynolds Tobacco Company, Inc.*, 7:20-cv-04257-TLW, 2023 WL 6157381, at *2 (D.S.C., September 21, 2023) (summary judgment appropriate where

[12] Arizona courts appear to have accepted Justice Martone's framework. In *Manterola v. Farmers Ins. Exchange*, the Arizona Court of Appeals appeared to recognize that, as a practical matter, Arizona courts followed Martone's concurrence and did not permit bad faith claims in the absence of breach of contract where coverage is the issue in bad faith. 30 P.3d 639, 646 (Ariz. Ct. App. 2001) (citing Martone's concurrence and noting "Although the pertinent Arizona decisions clearly have rejected the notion that a contractual breach or even policy coverage is a necessary element of all bad faith claims, none of the cases suggests that a carrier may be held liable for bad faith denial of coverage in the face of a final judicial determination that there was no coverage"); *see also*, *Permanent General Assurance Corporation v. Davis*, 2013 WL 12039998, at *3 (D.Ariz., 2013) (dismissing claim for bad faith, citing the concurrence in *Deese*, and noting "While the Court recognizes that showing a violation of the statute and a breach of contract are not prerequisites to proceeding on the other claims asserted by Ms. Davis (such as bad faith), these other claims are inextricably intertwined with the statutory and contract issues, otherwise do not state a claim, and are subject to dismissal."); *see also Richardson v. Guardian Life Ins. Co. of America*, 984 P.2d 917, 923, (Or.App., 1999) (noting that while "it is possible for an insurer to breach the duty of good faith without also breaching the insurance contract," "[h]ere, plaintiff relies on the same facts that he alleges constituted a breach of the insurance contract" to allege bad faith and therefore concluding it was not error for the trial court to dismiss the bad faith count.)

plaintiff could not prove ninth element of fraud). Here, Plaintiff cannot meet the second element of her cause of action for bad faith failure to pay. To the extent Plaintiff argues *Myers* saves her from this requirement, *Myers* does not accurately reflect the law of South Carolina. Indeed, *Myers* has not been cited once by a South Carolina appellate court. Moreover, while the motion for judgment on the pleadings was pending, the South Carolina Supreme Court *again* confirmed that a "refusal by the insurer to pay benefits due under the contract" remains one of the four necessary elements of the bad faith cause of action. *Hood v. United Services Auto Association*, 910 S.E.2d 767, 771 (S.C. 2025). Because Plaintiff's only allegation of bad faith is a "refus[al] to pay the UIM benefits" her claim fails, on the pleadings, but also outside of the pleadings.

Additionally, *Tadlock* should not apply to the facts of this case because Plaintiff seeks compensation for "refus[al] to pay," and she does not allege injury unrelated to the nonpayment of contractual benefits. The only logical construction of *Tadlock* is that it applies narrowly to situations where an insured complains of harm unrelated to payment of benefits under the contract. Broadening *Tadlock* to eliminate the second element of bad faith when payment is at issue, such as in this case, simply because allegations regarding "processing" are present allows the exception to swallow the rule. But as *Hood* made clear, the rule still exists: absent a *Tadlock* situation, bad faith requires proof of a refusal to pay benefits due under the contract.

**Conclusion**

Plaintiff is suing for failure to pay UIM benefits that are undisputedly not owed under South Carolina law. What's more, she has testified that even if the full UIM coverage had been offered to her, she would have rejected it, leaving her in no better or worse position than she is right now. Nevertheless, Plaintiff is simultaneously prosecuting one case to establish a future right to UIM

benefits in state court, and another case to establish a prior right to UIM benefits.[13] The consequences of this oddity began to unravel three days after the Court's Order when Plaintiff's counsel requested the deposition of State Farm's attorney. (*See* Mot. for Protective Order, ECF No. 14.) They will continue to unravel throughout the discovery process, up until the time when two different juries may be asked to twice determine the Plaintiff's right to UIM benefits. This process is not reflective of South Carolina law and, therefore, the Court should reconsider its Order regarding judgment on the pleadings and/or should grant State Farm summary judgment.

WHELAN MELLEN & NORRIS, LLC

By: s/ *Robert W. Whelan*
Robert W. Whelan
Federal Bar No. 9242
E-Mail: robbie@whelanmellen.com
89 Broad Street
Charleston, SC 29401
(843) 998-7099

*Counsel for State Farm Mutual Automobile Insurance Company*

July 24, 2025

Charleston, South Carolina

[13] This Court has previously declined to allow federal litigation concerning an insurer's evaluation of liability and damages when those same issues were being actively litigated in state court tort litigation. *Columbia Insurance Company v. Reynolds*, 225 F. Supp. 3d 375, 383 (D.S.C. 2016) ("[P]ermitting this case to go forward would create unnecessary entanglement between the federal and state courts.… The CIC conduct at issue in this case is CIC's evaluation of Mr. Waymer's conduct at issue in the Underlying Actions—the very conduct for which CIC may be liable in state court.").